IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 11-cv-01929-MSK-MJW

LAPRELL M. WADE,

        Plaintiff,

v.

WILLIAM B. SCHOOLCRAFT, M.D., P.C., d/b/a Colorado Center for Reproductive Medicine, P.C.

        Defendant.

---

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court pursuant to the Defendant's Motion for Summary Judgment **(# 32)**, Ms. Wade's response **(# 35)**, and the Defendant's reply **(# 40)**.

## FACTS

The Court merely summarizes the operative facts here, and elaborates as necessary in its analysis. Ms. Wade, a black woman, was employed by the Defendant ("CCRM") as a receptionist.

In early January 2011, Diane Tindall, CCRM's local Office Administrator, received e-mails from three CCRM employees, each of whom related certain events involving Ms. Wade that had occurred in late December 2010. The e-mails describe a situation in which Ms. Wade was in communication with L.S., a prospective patient, who was eager to begin fertility treatments prior to the first available appointment date that CCRM could provide. The e-mails contend that Ms. Wade, without consulting with medical officials at CCRM, contacted L.S.'s

1

referring doctor and requested that doctor to prescribe certain medical tests for L.S. in advance of her appointment and, thereafter, sought to advise that patient as to the significance of those test results.

Ms. Tindall spoke with the authors of the e-mails about the allegations, then provided the e-mails to Joan Youmans, CCRM's Corporate Administrator. Ms. Youmans, in turn, provided the e-mails to Dr. Schoolcraft, CCRM's CEO. Dr. Schoolcraft states that he was concerned that Ms. Wade's actions were inappropriate and potentially exposed CCRM to liability for medical malpractice. Accordingly, Dr. Schoolcraft contends that he made the decision to terminate Ms. Wade's employment.

Ms. Wade then commenced this instant action. Her Amended Complaint **(# 18)** asserts four causes of action: (i) race discrimination, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*; (ii) race discrimination, in violation of 42 U.S.C. § 1981; (iii) retaliation, in violation of Title VII; and (iv) retaliation, in violation of 42 U.S.C. § 1981.

The Defendant moves **(# 32)** for summary judgment on each of Ms. Wade's claims.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party

with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, the claim or defense must be dismissed as a matter of

law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### B. Race discrimination claims

Although Ms. Wade asserts claims of race discrimination under both Title VII and 42 U.S.C. § 1981, the same analysis applies under both statutes. *Amro v. Boeing Co.*, 232 F.3d 790, 796 (10th Cir. 2000). Thus, the Court will address both race discrimination claims in a single analysis.

To establish a claim of race discrimination, Ms. Wade bears the initial burden of establishing a *prima facie* case, showing: (i) she is a member of a protected class; (ii) she possessed the objective qualifications for the position she held; (iii) she suffered an adverse employment action; and (iv) that adverse action occurred in circumstances giving rise to an inference of discrimination. *Barlow v. C.R. England, Inc.*, ___ F.3d ___, 2012 WL 6685467 (10th Cir., Dec. 26, 2012) (slip op.), *citing Salguero v. City of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004). The burden then shifts to CCRM to articulate a legitimate, non-discriminatory reason for the adverse action, and Ms. Wade bears the ultimate burden of demonstrating that CCRM's proffered reason is a pretext for discrimination. *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114-15 (10th Cir. 2007).

CCRM does not dispute that Ms. Wade can establish a *prima facie* case. Instead it proffers, as its legitimate, non-discriminatory reason for her termination, that she engaged in misconduct by giving medical advice to L.S. without authorization. Thus, the Court turns to the question of whether Ms. Wade can demonstrate a triable factual dispute regarding whether this proffered reason is a pretext for discrimination.

An employee may attempt to demonstrate pretext by showing "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reasons that the trier of fact could reasonably conclude that the proffered reasons are untrue.[1] *Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). Typically, an employee will show that the stated reason is simply false, or that the reason is inconsistent with written or unwritten company policies or practices that apply to the conduct at issue. *Id.* However, in considering whether the proffered reason is "true" or "false," the Court must focus on the facts as they appeared to the person making the decision. *Piercy v. Maketa*, 480 F.3d 1192, 1200 (10th Cir. 2007). The Court's inquiry is not whether the decision was wise, ontologically correct, or even particularly fair; even "a mistaken belief" that a particular set of circumstances occurred "can be a legitimate, non-pretextual reason for an employment decision." *Id.* Rather, the Court's examination is merely whether the decisionmaker subjectively believed the proffered reason to be true and whether it acted in good-faith upon that belief. *Id.*

Thus, the Court begins its task by ascertaining who the decisionmaker was. CCRM has proffered the affidavit of Dr. Schoolcraft, its CEO, attesting that "I made the decision that Ms. Wade be terminated" and that "I did not seek input from anyone in conjunction with that decision." Ms. Wade points out that, in response to an interrogatory asking CCRM to "identify the person(s) responsible for making the decision to terminated Plaintiff," CCRM answered "Dr. William Schoolcraft and Joan Youmans." Ms. Wade also makes an abbreviated argument that Dr. Robert Gustofson was also involved in the decision to terminate, but the excerpt of Mr. Gustofson's deposition that Ms. Wade cites to clearly indicates that Dr. Gustofson believed that

---

[1] The employee is also obligated to demonstrate that the employer's true reason for the adverse action was motivated by discrimination. However, the mere fact that the employer has proffered an untrue reason for the action can be sufficient to raise an inference that discrimination was the true reason. *Plotke*, 405 F.3d at 1102, *citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

Dr. Schoolcraft and Ms. Youmans were the people who made the decision, and that any input Dr. Gustofson had on the matter was given only to Ms. Tindall, not to Dr. Schoolcraft or Ms. Youmans.  Taking the evidence in the light most favorable to Ms. Wade, then, the Court assumes that the decision to terminate was jointly made by Dr. Schoolcraft and Ms. Youmans.

Next, the Court looks to the facts as they appeared to Dr. Schoolcraft and Ms. Youmans. It is undisputed that Ms. Tindall supplied Ms. Youmans (and that Ms. Youmans thereafter supplied Dr. Schoolcraft) with the three e-mails from three CCRM employees describing their observations of Ms. Wade's actions with regard to (prospective) patient L.S., and that those e-mails described a scenario in which Ms. Wade had, without authorization, contacted the doctor of a potential CCRM patient and requested that doctor to prescribe certain tests for the patient. Moreover, the record indicates that Ms. Tindall stated that she had spoken to each of the e-mails' authors and confirmed that what was stated in the e-mails was what the authors observed.  It does not appear that any CCRM representative spoke to Ms. Wade or inquired about her version of events before Dr. Schoolcraft and Ms. Youmans made the decision to terminate her employment.[2]

One might question the wisdom or fairness of an employer making a decision in circumstances like this without first hearing the employee's version of events, but as noted above, a decision is not pretextual simply because it is unwise or unfair, so long as the employer subjectively believed in the truth of the allegations.  Here, the record indicates that Dr. Schoolcraft and Ms. Youmans had statements from two employees offering corroborating descriptions of the same event, along with an e-mail from Dr. Gustofson detailing his discussion

---

2 Ms. Youmans' affidavit states that she discussed the allegations with Ms. Wade when informing her of her termination, and that Ms. Wade "did not generally dispute the facts."  The Court notes that Ms. Wade's deposition testimony denies that she requested L.S.'s doctor to initiate any testing.

with L.S.'s doctor, who confirmed that Ms. Wade had contacted the doctor to request the testing. Under these circumstances, the Court finds that there is no genuine dispute of fact as to whether Dr. Schoolcraft and Ms. Youmans believed that the allegations against Ms. Wade were accurate.

Having concluded that Dr. Schoolcraft and Ms. Youmans subjectively believed that Ms. Wade had engaged in misconduct by requesting L.S.'s doctor to order certain tests and by attempting to advise L.S. as to the results of those tests, the only remaining question is whether Dr. Schoolcraft and Ms. Youmans in good faith believed that termination was an appropriate punishment. Affidavits by Dr. Schoolcraft and Ms. Youmans indicate that both thought that Ms. Wade's conduct was serious and placed CCRM in a position of potential liability. Indeed, Ms. Wade agreed in her deposition that if CCRM management indeed believed that she had "contacted a referring physician on [her] own and directed that physician to order certain tests before a new patient appointment," that would have been a proper basis for terminating her employment.

Ms. Wade contends that CCRM has inconsistently applied its policies, insofar as other, white employees engaged in similar conduct and were not terminated. The sole example that Ms. Wade describes is that of Tara Lampson, an ultrasound technician whom Ms. Wade contends "did an ultrasound [on a prospective patient], reviewed the results, and asked several medical-related questions" without first obtaining authorization from one of CCRM's doctors, and, on another occasion, administered an ultrasound test to a non-patient and verified that the non-patient was pregnant.

The Court finds such evidence insufficient to raise a triable issue of fact on the question of pretext for three reasons. First, to the extent Ms. Lampson simply administered an ultrasound

test, she was acting within the scope of her medical training (albeit using her employer's facilities without apparent permission), whereas there is no indication that Ms. Wade has any medical training whatsoever. Second, the record does not reflect that Ms. Youmans or Dr. Schoolcraft, the decisionmakers here, were ever aware of Ms. Lampson's conduct; at best, Ms. Wade has only come forward with evidence that <u>might</u> suggest that Dr. Gustofson may have known about the first incident with Ms. Lampson. Third, the record indicates that the first incident occurred in 2007, and the second in either 2005 or 2006. Ms. Wade acknowledges that, as of February 2010, CCRM "instituted a personnel policy cautioning employees not to provide advice which is not within their license or scope of practice." Thus, it is not necessarily clear that Ms. Lampson's conduct violated a CCRM policy, whereas Ms. Wade's certainly did. As a result, the Court cannot say that Ms. Lampson is similarly-situated to Ms. Wade, such that any inference of pretext can be drawn from the difference in treatment afforded them.

Ms. Wade also makes a general assertion that several CCRM officials, including Ms. Tindall and Dr. Gustofson, harbored animus towards her. She states that from 2008 to 2011, Dr. Gustofson and Ms. Tindall repeatedly accused her (falsely) of various acts of minor misconduct. These allegations are irrelevant, as neither Ms. Tindall nor Dr. Gustofson made the decision to terminate Ms. Wade's employment. The only allegations of this type that include Ms. Youmans are a situation in 2009 in which Ms. Youmans "berated" her "for not taking responsibility for" certain disciplinary actions that Ms. Tindall had handed down (which led to an exchange of correspondence between Ms. Wade and Ms. Youmans in which Ms. Wade repeated her previously-stated belief that she believed she was being discriminated against and Ms. Youmans responded that CCRM prohibits discrimination and that Ms. Wade need not submit any further

letters making such an accusation, as her feelings had been "made clear"), and a situation in 2010 in which Ms. Youmans initiated a formal investigation of whether Ms. Wade had told a co-worker that the co-worker would be fired if she made one more mistake.

Even crediting Ms. Wade's allegations in these respects, the Court finds that she has not demonstrated a triable issue of fact as to whether Ms. Youmans' joint decision with Dr. Schoolcraft to terminate Ms. Wade was a pretext to shield Ms. Youmans' discriminatory animus. At best, the record shows that Ms. Youmans and Ms. Wade had a few instances of conflict, but nothing suggests that this conflict calls into question Ms. Youmans' subjective belief that Ms. Wade had indeed committed misconduct in the situation involving L.S., nor suggest that Ms. Youmans' decision favoring termination was somehow racially-based. Ms. Wade does not point to any particular conduct of Ms. Youmans that would permit the trier of fact to assume that the conflict between them was the result of racial animus, such as racially-charged comments or behavior by Ms. Youmans. Indeed, the sole basis for Ms. Wade's assumption that Ms. Youmans was "discriminating" against her arises simply from the fact that Ms. Wade was the only black employee at CCRM. Moreover, the record reflects that Dr. Schoolcraft concurred in the decision to terminate Ms. Wade, and Ms. Wade points to no evidence whatsoever to suggest that Dr. Schoolcraft might have similarly reached that conclusion out of racial animus.

Accordingly, the Court finds that Ms. Wade has failed to demonstrate a triable issue of fact as to whether CCRM's proffered reason for her termination is pretextual. CCRM is therefore entitled to summary judgment on her race discrimination claims.

### C. Retaliation

As with the race discrimination claims, Ms. Wade's Title VII and § 1981 retaliation

claims are analyzed under the same framework.  Ms. Wade must first establish a *prima facie* case of retaliation by showing: (i) she engaged in a protected activity; (ii) she suffered an adverse employment action; and (iii) there is a causal connection between the protected activity and the adverse action.  *Daniels v. United Parcel Service, Inc.*, 701 F.3d 620, 638 (10th Cir. 2012).  CCRM must then articulate a legitimate, non-retaliatory reason for the adverse action, and Ms. Wade bears the final burden of proving that the proffered reason is a pretext for retaliation.  *Id.* at 639.

CCRM contends that Ms. Wade cannot establish a *prima facie* case of retaliation because she cannot show a causal connection between her termination – the only adverse action at issue here – and her protected conduct of filing a charge of discrimination with the EEOC on May 14, 2010.  Close temporal proximity between a protected act and an adverse action may raise an inference of a causal connection between the events, but only where the temporal window is relatively short – *e.g.* a matter of days or a few weeks.  *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1228 (10th Cir. 2008); *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006), *citing Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (three-month period, standing alone, insufficient to infer causation).  CCRM argues that the more than seven-month period between Ms. Wade's May 2010 EEOC charge and her January 2011 termination thus defeats any potential inference of causation.

Ms. Wade responds that the protected activity she relies upon is not her May 2010 EEOC charge, but rather, two e-mails that she sent to Dr. Schoolcraft in October 2010.  Those lengthy e-mails, expressing Ms. Wade's disagreement with formal counseling she had received, assert (among other things) that "this is just a continuation of retaliation due to my complaints of racial

harassment and discrimination that has been going on since 2009. The last two counseling sessions . . .are just another ruse for racial discrimination and retaliation and trying to terminate my employment with CCRM by Joan Youmans, Dr. Gustofson, yourself, and others." Ms. Wade points out that the temporal window between the last e-mail, on October 18, 2010, and her termination on January 5, 2011, is approximately 2.5 months.

Although courts have often discussed whether a given temporal proximity is sufficiently close to permit an inference of causation, this Court resists a reading that suggests that such an analysis can be reduced to a definitive point – *i.e.* that three months is too long, but ten or eleven weeks might be sufficient. Rather, the Court treats the temporal proximity analysis as a continuum – the larger the temporal window, the weaker the inference of causation and the more likely it is that other circumstances will defeat any inference of causation. *See e.g. White v. Shafer*, 738 F.Supp.2d 1121, 1136 n. 9 (D. Colo. 2010) (any inference of causation arising from proximity "somewhere between two and three full months" defeated by parties' reasoned mediation of employee's complaints in the interim). Here, as in *White*, Ms. Wade's October 2010 e-mails "strain[ ] the outer boundaries of the temporal proximity test," suggesting that any inference of causation that arises is thin at best. *Id.* And, as in *White*, other unusual circumstances operate to completely disperse that thin inference.

The record reflects that, beginning in 2008, Ms. Wade regularly made allegations of discrimination and retaliation against CCRM and its officials. Her brief states that "each time allegations were made [against her,] Plaintiff offered a rebuttal letter to be placed in her personnel file," explaining "that she was being treated differently because of her race." She further states that between February 2009 and May 2010, "she filed three charges of

11

discrimination with the EEOC." It is somewhat difficult to believe that, despite three years of being regularly accused of discrimination and retaliation in rebuttal letters, as well as being named in three formal charges, all without responding, CCRM suddenly elected to retaliate against Ms. Wade because of the particular allegations she made in her October 2010 e-mails. Thus, under the circumstances presented here – a relatively lengthy temporal proximity, coupled with an extended history of Ms. Wade accusing CCRM of racial discrimination without any adverse response from CCRM – the Court has profound doubts that Ms. Wade could successfully establish a *prima facie* case of retaliation.

But, even assuming she could, the Court would nevertheless find that CCRM carries its burden of articulating a non-retaliatory reason for her termination, and that Ms. Wade cannot carry her burden of demonstrating that reason to be pretextual. As above, the record reflects that Ms. Youmans and Dr. Schoolcraft subjectively believed that Ms. Wade had engaged in misconduct with regard to L.S.'s situation, and Ms. Wade concedes that, if CCRM truly believed she had engaged in such conduct, termination would be appropriate. Far from demonstrating pretext, the frequency of Ms. Wade's complaints of discrimination and retaliation over a three-year period and the absence of any significant job-related response by CCRM suggests that CCRM was ignoring, rather than being provoked by, those complaints. Accordingly, the Court finds that Ms. Wade cannot establish a triable issue of fact as to whether CCRM's stated reason for her termination was pretext for retaliation.

## CONCLUSION

For the foregoing reasons, CCRM's Motion for Summary Judgment **(# 32)** is **GRANTED**. The Clerk of the Court shall enter judgment in favor of CCRM and against Ms.

Wade on all claims in this action.

Dated this 8th day of February, 2013.

**BY THE COURT:**

*/s/ Marcia S. Krieger*

Marcia S. Krieger
Chief United States District Judge

13